AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**SEALED**

**FILED**

Nov 08, 2023

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| United States of America | ) |
| v. | ) |
|  | ) |
| Irma Olguin, Jr. | ) |
| and Jake Soberal | ) |
|  | ) |
|  | ) |
| *Defendant(s)* |  |

Case No.  1:23-mj-00136-SKO

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  January 2022 through May 2023  in the county of  Fresno  in the

Eastern  District of  California  , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC 1349 | Conspiracy to commit wire fraud |
| | Maximum penalties: Twenty years in prison |
| | Fine of $250,000 |
| | Three years of supervised release |
| | Special assessment of $100 |

This criminal complaint is based on these facts:

See attached Affidavit, which is incoporated by reference as though fully set forth herein.

☑ Continued on the attached sheet.

*Complainant's signature*

Chet Johnston, FBI Special Agent

*Printed name and title*

Sworn to me under oath by telephone pursuant to FRCP 4.1:

Date:  11/8/2023

*Judge's signature*

City and state:  Fresno, California

Hon. Sheila K. Oberto, U.S. Magistrate Judge

*Printed name and title*

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Chet Johnston, being duly sworn, depose and state as follows:

## I.     INTRODUCTION

1.      I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since 2008. I am a graduate of the FBI's Basic Field Training Program in Quantico, Virginia.  I am currently assigned to the FBI's Office in Fresno, California, where I am a member of the white-collar crime squad.  As such, I have been involved in several criminal investigations involving investor fraud, loan fraud, and other complex financial frauds.  My duties include interviewing victims and witnesses, executing searches for evidence, reviewing financial records and other documentary evidence, conducting research on the internet and other sources, consulting with different types of experts, making arrests, and testifying in court proceedings.  Prior to joining the FBI, I was a police officer in Colorado.

2.      This Affidavit is made in support of a federal criminal complaint and arrest warrants charging Irma Olguin, Jr. and Jake Soberal with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.  The facts in this Affidavit come from my training and experience, personal involvement in this case, and information obtained from other law enforcement agents who are involved in the case. This Affidavit is meant to show that there is probable cause for the requested complaint and arrest warrants.  It does not set forth all of my knowledge about the case.

## II.     APPLICABLE LAW

3.      Title 18, United States Code, Section 1349 provides that anyone who attempts or conspires to commit wire fraud in violation of 18 U.S.C. § 1343 shall be imprisoned up to twenty years, fined up to $250,000, or both.

4.      Title 18, United States Code, Section 1343 provides that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property, by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, is guilty of wire fraud.

### III.    STATEMENT OF PROBABLE CAUSE

**A. Overview, and Olguin, Jr. and Soberal's Admissions to Wrongdoing**

5.      Press articles, civil court records, and bankruptcy court records obtained by the government showed that, in late May 2023, the Fresno, California-based technology company, Bitwise Industries ("Bitwise"),[1] abruptly collapsed despite recent reports the company was worth over $500,000,000 and was financially sound.  All of the company's approximately 900 employees and apprentices were immediately furloughed and later laid off, and the company's board of directors fired the founders and co-Chief Executive Officers, Irma Olguin, Jr. and Jake Soberal.

6.      The FBI and Internal Revenue Service: Criminal Investigation ("IRS:CI") conducted an extensive investigation into Bitwise.  The government has interviewed dozens of people, including Olguin, Jr. and Soberal, as well as former Bitwise board members, employees, investors, and lenders. The government has also obtained hundreds of thousands of pages of relevant documents, including board presentations, investor pitch materials, and other financial records, as well as text messages and emails, recordings, and other evidence.  Finally, the government has interviewed Olguin, Jr. and Soberal, and they have admitted to significant criminal misconduct.  The investigation has determined that their criminal misconduct caused more than $100,000,000 in losses.

7.      Olguin, Jr. and Soberal were interviewed by the government in September 2023 and admitted to significant wrongdoing.  Their admissions are discussed throughout this affidavit where relevant.  In sum, Olguin, Jr. and Soberal have admitted that, beginning no later than January 2022, they conspired with each other to lie to board members, investors, lenders, and others about Bitwise's finances to obtain investment money and loans.  They did so by fabricating financial information in board presentations and investor materials, as well as altering and forging bank statements, board consents, and other financial records to inflate the company's revenues, cash balances, and property holdings.  They also misled the board members, investors, lenders, and others into believing Bitwise was excelling when it was instead failing.

---

[1] Bitwise had a parent company and several other related entities.  These entities were all controlled by Olguin, Jr., Soberal, and the board of directors.  Therefore, the entities are being referred to generally, and collectively, as Bitwise for purposes of this affidavit.

8.      Olguin, Jr. and Soberal have maintained that they were the only ones at Bitwise who were involved in the criminal activity and that they limited other employees' access to information to conceal their scheme to defraud.  As discussed below, Olguin, Jr. and Soberal conspired to carry out the scheme to defraud.  The government's investigation to date has not identified other conspirators.

**B.  Bitwise's Operational Design**

9.      In approximately 2013, Olguin Jr. and Soberal founded the startup company that ultimately became Bitwise.  According to them, the stated goals were to create job opportunities for underserved groups of people, revitalize blighted urban areas, and show that such a project could be profitable.  The company grew to have three business lines.  The first business line was a workforce training program that prepared apprentices for technology jobs.  The second business line was a consulting service that developed software and websites, staffed call centers, and provided related technology services to customers.  The third business line was a real estate arm that bought, renovated, and leased commercial properties.  After the properties were fully leased, Bitwise would sell its stake in the properties and remain as the property manager for a share of the revenue.

10.     The three business lines were supposed to complement each other.  That is, the training program was supposed to provide employees and apprentices for the consulting service, and the real estate arm was supposed to provide offices for all of the business lines.

11.     Olguin, Jr. explained that she focused on the internal aspects of Bitwise, such as hiring, organizing, and managing the company's employees and teams.  Soberal explained that he was in charge of the company's finances, such as presenting financial information to the board and finding investors and lenders.  They have maintained that they were equals at the company and close friends, and that they always consulted with each other before making business decisions.  They were each making approximately $600,000 per year when the company collapsed.

**C.  Bitwise's Rapid Growth**

12.     By 2017, Bitwise had grown to over fifty employees and apprentices, and Olguin Jr. and Soberal were introduced to INVESTOR ONE.  INVESTOR ONE is a pioneer in the tech industry.

13.     INVESTOR ONE was interviewed by the government.  He said that he was impressed with Bitwise, and after meeting with Olguin Jr. and Soberal and touring the company, he agreed to join

the company's board and lead it in a Series A investment round.  Based on my training and experience, a Series A investment round is an investment in a startup company that has built a persuasive business model and shows the potential for significant revenue growth.  It often refers to the first round of venture capital funding that a company receives.

14.     INVESTOR ONE said that he was later joined on Bitwise's board by INVESTOR TWO's REPRESENTATIVE, INVESTOR THREE, and INDIVIDUAL ONE, and that Olguin, Jr. and Soberal held the two remaining seats.  INVESTOR TWO's REPRESENTATIVE was then the managing partner of INVESTOR TWO, which was a Virginia-based venture capital firm.  INVESTOR THREE also operated a venture capital firm.  INVESTOR ONE explained that INVESTOR TWO's REPRESENTATIVE and INVESTOR THREE received their seats on the board because of their investments in Bitwise, and that INDIVIDUAL ONE was picked for her seat based on her experience. All of the board members were interviewed by the government.

15.     Records produced by Bitwise's board showed that the company's Series A round closed in December 2019 and raised over $20,000,000 for the company.  This was the largest investment that the company had received to date.  The investors included INVESTOR ONE and his related entities, INVESTOR TWO, and INVESTOR THREE and his related entities.

16.     According to INVESTOR ONE, Bitwise was a relatively new company and there was not much information available for due diligence.  Instead, his decision to lead the Series A and invest in the company was based on his conversations with Soberal.  He explained that, while Bitwise's business plan was complex and risky, the company's stated goals and culture of inclusiveness aligned with his own values.  He further explained that he trusted Soberal and believed that the company would succeed because its business lines complimented each other so well.

17.     INVESTOR ONE said that the Series A money was supposed to help Bitwise expand into Bakersfield, Merced, and other cities in California.  He explained, however, that most of the money went towards buying out some of the company's early investors and that there was only a few million in Series A funds left over.

18.     One of Bitwise's early investors, who was bought out after the Series A, said that Olguin, Jr. and Soberal were growing the company too quickly and that he preferred a slower, more conservative

pace.  Another early investor, who kept his shares and later leased properties to Bitwise, said that the company never had a business model and that it was all just a bunch of hype.  He explained that he now regrets not getting out while he still could.

19.     A few months after the Series A, records produced by Bitwise's board showed that Olguin, Jr. and Soberal began a Series B investment round that closed in December 2021 and raised over $48,000,000 for the company.  Based on my training and experience, a Series B investment round refers to an investment in a company that has become fully operational and is ready to further expand.  It often refers to the second round of venture capital money that a company receives.  The Series B investors again included INVESTOR ONE and his related entities, INVESTOR TWO, and INVESTOR THREE and his related entities.  INVESTOR ONE said that the money was supposed to help Bitwise expand to cities outside of California.

**D.  Olguin, Jr. and Soberal Repeatedly Submitted Materially False Financial Information to the Bitwise Board of Directors**

20.     By the end of 2021, Bitwise had raised more than $70,000,000 in investment funds overall, and had grown to approximately 400 to 500 employees and 100 to 300 apprentices in multiple offices and states.  Thereafter, as all of the board members confirmed to the government, Olguin, Jr. and Soberal were responsible for the financial information that was given to the board.  The information provided by Olguin Jr. and Soberal made it appear as though the company was performing well in terms of revenue and cash on hand.  For example, in a February 2022 Board presentation and July 2022 investment memorandum, they represented that Bitwise's cash balance was over $44,000,000 as of December 31, 2021.  They also represented that the company's revenue for the year was more than $58,000,000.  Bank records, however, showed that the company's cash balance was approximately $11,700,000 at the close of 2021.  And, as discussed below, the revenue was fabricated according to the company's former Chief Financial Officers ("CFO") and other key finance personnel.

21.     In a March 2023 Board presentation obtained by the government, Olguin, Jr. and Soberal further represented that Bitwise's cash balance was over $77,000,000 as of December 31, 2022, and that the company's revenue for the year was more than $143,000,000.  Bank records, however, showed that

the company's actual cash balance was less than $5,000,000 at that time.  And again, as discussed

below, the revenue was fabricated.

22.     Numerous Bitwise board members and employees confirmed that Olguin, Jr. and Soberal

were responsible for the financial information that was presented to the board.

**E.  Bitwise's True Financial Condition was Concerning**

23.     Despite Olguin, Jr. and Soberal raising tens of millions of dollars in investments and

reporting that the company was in a strong financial condition, bank records showed that, by June 1,

2023, Bitwise had less than $1,500,000 left.  The following chart that the FBI prepared based on the

bank records depicts the company's rapid depletion of cash from 2022 through the company's collapse:



**i.     Olguin, Jr. and Soberal Knew About the Company's Cash Problems**

24.     As previously discussed, EMPLOYEE ONE was Bitwise's President and third-in-

command.  EMPLOYEE ONE told the government that she had access to the company's bank accounts

along with Olguin, Jr. and Soberal, and that the company was constantly running low on cash and could

barely keep up with its approximate $5,000,000 per month in payroll expenses.  She and other

employees explained that, at times, the company would issue them paper checks instead of using direct

deposit.  This was because, with paper checks, the funds were only drawn from the company's account

when the checks were deposited or cashed.  Whereas, with direct deposit, the funds were drawn

simultaneously when the deposit was initiated.  EMPLOYEE ONE further explained that she would be

notified whenever an employee's check did not clear so that she could move money around to cover it.

25.     EMPLOYEE ONE said that she talked to Olguin, Jr. and Soberal about the company's cash problems on several occasions and they told her not to worry about it and they would take care of everything.  EMPLOYEE ONE explained that Olguin, Jr. and Soberal would often make short term loans to the company that would be repaid with ten percent interest and that they would ask her and other key personnel to do the same.  They called it "passing the hat."  EMPLOYEE ONE further explained that she was careful to only make one loan at a time and that the loans were generally paid back until the company collapsed.  She confirmed that the company did not have $77,000,000 at any point in 2022 and that the actual balances were much lower.

### ii.   Bitwise was Losing Millions of Dollars Each Year

26.     CFO ONE was Bitwise's CFO from June 2020 through September 2021, and he was interviewed by the government.  He was previously the senior director of finance for a major television station and vice president of finance for a cloud computing company.

27.     CFO ONE confirmed that Bitwise was always cash-negative while he worked there, which meant that there was more money going out than there was money coming in.  He estimated that the company lost over $20,000,000 per year.

28.     When CFO ONE was hired, Bitwise's financials were in disarray and the company was not using Generally Accepted Accounting Principles ("GAAP").  Based on my training and experience, GAAP is the accounting standard adopted by the United States Securities and Exchange Commission, and it is the default accounting standard used by companies in the United States.  GAAP is a combination of authoritative standards and commonly accepted ways of recording financial information. It aims to improve the clarity, consistency, and comparability of such information across companies so that people can determine how a given company is actually performing.

29.     Instead of GAAP, CFO ONE said that Olguin, Jr. and Soberal were using managerial accounting practices to report financial information to the board and investors.  Based on my training and experience, managerial accounting practices are strictly for a company's internal use because these practices are based on a company's trends, goals, and estimates rather than its true, past performance. Such practices are far less exact than GAAP and can be subjective.

30.     CFO ONE said that he adjusted Bitwise's financials to reflect GAAP.  He explained that the company's revenue for 2020 was reduced from approximately $30,000,000 to $9,000,000, and that the company's revenue for the first quarter of 2021 was reduced from approximately $10,000,000 to $1,000,000.  CFO ONE said that Olguin, Jr. and Soberal were unhappy with the adjustments and told him that he was wrong, and they asked him to double check his work.  He did so and confirmed that he was correct.  He also advised them that they needed to use GAAP with the board members and investors going forward.

31.     CFO ONE subsequently engaged AUDIT FIRM ONE, which is an international audit, tax, and advisory services firm based in the United States, to perform an audit of the company's financials.  The audit report, however, was not completed until April 2022 after he had left the company. He explained that wanting to use managerial financials instead of GAAP became a recurring problem with Olguin, Jr. and Soberal that caused him a great deal of stress, and that was why he left Bitwise. CFO ONE further explained that he only attended two board meetings and that he did not talk to the board members directly about the company's financials.

32.     CFO TWO was Bitwise's CFO from January 2023 until May 2023.  She was previously in the corporate development department for a major aircraft manufacturer, and then was the CFO for robotics and unmanned aerial vehicle startup companies.

33.     Bitwise did not have a CFO for the fourteen months between when CFO ONE left and CFO TWO started.  Olguin, Jr. and Soberal maintained that they were busy and had trouble finding a good candidate.  However, several board members and other key finance personnel who were interviewed now believe that the absence of a CFO was by design.

34.     CFO TWO said that she decided to join Bitwise after receiving a board presentation from Soberal that showed the company was performing well financially.  After starting at the company, however, she realized that the financial information in the presentation did not match the actual financial information in the company's accounting system.  She explained that the company's actual financials were much worse and that no one had reconciled the books for over a year.  By reconciling the books, she meant reviewing financial records on a monthly basis to determine the company's profit and loss and cash balance, which was a common practice for other companies in her experience.

35.     CFO TWO asked Soberal where he had gotten the financials that were in the board presentation he sent her, and Soberal said that he had a "bridge," or roadmap, with all the details.  CFO TWO explained that she continually asked Soberal for this bridge until the company collapsed but never received it.  She does not believe that the bridge existed.  She also asked the company's Chief Revenue Officer, EMPLOYEE TWO, if he knew where Soberal obtained the financials.  EMPLOYEE TWO told her he had no idea where the numbers came from.

36.     In an effort to try to better understand Bitwise's financials, CFO TWO said that she set up monthly meetings with Olguin, Jr. and Soberal that CFO TWO called the "monthly brain dump."  She explained that the meetings were not helpful.  For example, during the first meeting, Olguin, Jr. and Soberal gave her a list of contracts they claimed was worth $40,000,000 to $45,000,000 in revenue.  CFO TWO reviewed the underlying contracts and confirmed that the actual revenue was much lower because Bitwise had not performed any of the work required under the contracts.  She further explained that the company's revenue team met with Olguin, Jr. every other week to discuss revenue and that the numbers reported in those meetings were nowhere near what Olguin, Jr. and Soberal were telling the board and investors.  CFO TWO confirmed that at least Soberal was aware of, and likely understood, how GAAP worked and when these principles were supposed to be used.

37.     CFO TWO said that she attended Bitwise's board meetings.  But she explained that the company collapsed before she could figure out what was going on with the financials.  EMPLOYEE ONE told the government that Soberal had instructed Olguin, Jr. and her to keep the company's cash problems away from CFO TWO.

### iii.     Key Finance Personnel Confirmed Bitwise's Financial Struggles

38.     Bitwise's financial struggles were further confirmed by the company's former Controller and other top finance employees who were interviewed by the government.  This included EMPLOYEE TWO, EMPLOYEE THREE, EMPLOYEE FOUR, and EMPLOYEE FIVE.

39.     As discussed above, EMPLOYEE THREE was Bitwise's longtime Controller.  She held that position from October 2017 through April 2022, and then she moved onto other non-finance related positions within the company.  She had previously been a controller for an air pollution control district.  EMPLOYEE FOUR was a Senior Accountant at Bitwise from January 2020 through December 2021, an

Assistant Controller reporting to EMPLOYEE THREE from January 2022 through July 2022, and then Vice President of Finance and Accounting from August 2022 until May 2023.  She had previously been an accountant and controller at various businesses.

40.    Both EMPLOYEE THREE and EMPLOYEE FOUR said that Bitwise had few actual customer sales, the company's revenues were always low, and the company was not close to being profitable.  They also said that they always prepared GAAP-compliant financials and talked to Olguin, Jr. and Soberal about the importance of doing so.  Nonetheless, EMPLOYEE THREE explained that Soberal routinely asked her to prepare managerial financials that included sales that had not materialized and therefore did not qualify as revenue under GAAP.  EMPLOYEE THREE believes that these managerial financials are what Olguin, Jr. and Soberal ultimately presented to the board and investors.

41.    EMPLOYEE THREE and EMPLOYEE FOUR also said that they talked with Olguin, Jr. and Soberal about the low amount of cash that Bitwise had on hand and how the company was going to pay its bills.  They confirmed that the company had to resort to issuing paper checks on several occasions to buy time for the company to get more money.  They estimated that the company's payroll had reached $5,000,000 to $6,000,000 monthly, or $60,000,000 to $72,000,000 annually, when the company collapsed.  Their estimates did not include insurance costs, retirement plan contributions, taxes, rent, utilities, or other overhead and administrative expenses.

42.    EMPLOYEE THREE and EMPLOYEE FOUR said that they did not attend any of the Bitwise board meetings and had no contact with the board members.  They also confirmed that Bitwise did not have the approximately $77,000,000 in cash at the end of 2022, $58,000,000 in revenue for 2021, or $143,000,000 in revenue for 2022 as Olguin, Jr. and Soberal reported to the board.

43.    EMPLOYEE THREE further commented that she did not understand Bitwise's hiring practices.  She explained that Olguin, Jr. and Soberal seemed to hire a lot of friends, family members, and acquaintances who were not qualified for their jobs, paid everyone high salaries, and gave people large raises despite the company's financial struggles.

44.    EMPLOYEE TWO was Bitwise's Chief Revenue Officer from approximately March 2021 through December 2022, and he is now the chief transformation officer at a major university.  He was previously an executive at different education companies.

45.     EMPLOYEE TWO said that he did not know Bitwise's revenue for 2021, but he believed the company's revenue for 2022 was approximately $20,000,000.  He explained that Olguin, Jr. and Soberal always told him offhand about what they termed "magic deals," such as a $50,000,000 contract with the State of California or $20,000,000 contract with the State of Colorado for which he never saw any supporting paperwork.  He further explained that neither Olguin, Jr. nor Soberal brought these deals up at the bi-weekly revenue team meetings where revenue was discussed, which he thought was odd.  EMPLOYEE TWO confirmed he only attended one board meeting just to introduce himself.

46.     EMPLOYEE FIVE was a Senior Accountant at Bitwise from April 2022 through May 2023.  He previously owned his own mechanic shop and was an auditor for an accounting firm.

47.     When he first started at Bitwise in April 2022, EMPLOYEE FIVE said that he asked EMPLOYEE THREE for the company's "burn rate" sheet to see how fast it was spending money.  He explained that, in his experience, this was a common tool for a company to use for budgeting and other purposes.  EMPLOYEE THREE told him that Bitwise did not track its expenditures, which was the first of many red flags for him.  EMPLOYEE FIVE further explained that, based on his calculations, Bitwise's total revenue for 2022 was only $2,000,000 to $3,000,000 and was maybe $400,000 for the first quarter of 2023.  He did not believe that this was nearly enough to support the number of employees and apprentices the company had working for it.  He then emphasized that the company had fifty-three executive assistants and another fifty people on its marketing team alone who were not doing much of anything as far as he could tell.

48.     With the exception of CFO TWO, EMPLOYEE FIVE said that many others in management and finance at Bitwise were either incompetent or acting with malice but that he did not know which one it was.  He also said that nepotism was rampant at the company.  For example, he explained that in the months and weeks leading up to the collapse, Soberal got a new Tesla.  Records produced by Bitwise employees, and bank records received by the government, confirmed that the Tesla was purchased with company funds.

49.     EMPLOYEE FIVE further explained that Soberal once asked him to recognize the rent Bitwise paid in a building it had previously sold as revenue and that EMPLOYEE FOUR tried to get him to change financials so the numbers looked better for a board meeting.  He knew that these requests

were inappropriate and refused to comply.  EMPLOYEE FIVE was joined in his criticism of

EMPLOYEE FOUR by CFO TWO, who said that EMPLOYEE FOUR did not know how to read

financials and was probably not smart enough to know when something was unethical.  Finally,

EMPLOYEE FIVE explained that when the paper checks Bitwise issued to its employees towards the

end began bouncing, Olguin, Jr. sent an email to everyone saying that it was because Bitwise had so

much money the banks could not keep up.  He did not understand how that was possible.

50.     None of the Bitwise board members or employees who were interviewed could explain

where the high cash balances and revenues that Olguin, Jr. and Soberal reported to the board came from.

The board members also confirmed that they did not hear about the issuance of paper checks until the

company collapsed.

### iv.   Bitwise's Continued Hiring Despite Financial Struggles

51.     The government's investigation found that Olguin, Jr. and Soberal directed Bitwise to

continue hiring and promoting unqualified people who were paid exorbitant salaries despite the

company's financial struggles.  EMPLOYEE SIX, who was interviewed by the government, is one

example.  EMPLOYEE SIX said that she had just graduated college with a degree in business and was

working part-time at a coffee shop when she was hired by Bitwise to be an Executive Assistant.

Thereafter, EMPLOYEE SIX explained that she was quickly promoted to Vice President of Hiring

where she made over $125,000 per year.  This was despite her not having any professional work

experience let alone experience hiring people.  EMPLOYEE SIX further explained that there were no

rules at Bitwise for how many people she hired and that she even received approval to hire multiple

people the week before the company collapsed.

52.     EMPLOYEE SEVEN, who was interviewed by the government, is another example.

EMPLOYEE SEVEN said that she graduated college with a fine arts degree and worked as an assistant

at several businesses and non-profits before being hired by Bitwise in 2016 to be an evangelist.

According to several other employees who interviewed, however, she was really a tattoo artist before

starting at the company.

53.     EMPLOYEE SEVEN explained that, as an evangelist for Bitwise, she was supposed to

spread the good news about the company and organize community events.  She then quickly became the

company's Vice President of Operations, Chief Operating Officer ("COO"), and, finally, Chief Growth Officer where she made $300,000 per year.[2]

54.     EMPLOYEE EIGHT, who is related to Olguin, Jr., is yet another example.  The same early investor who said that Bitwise was all just a bunch of hype explained that EMPLOYEE EIGHT was the head of the company's real estate team despite having never worked in the industry before.  He emphasized that her prior job was being a maintenance worker for a community college district.

F.   **Olguin, Jr. and Soberal Became Desperate After a Key Proposed Investment Fell Through, and They Began Fabricating and Altering Bitwise's Financial Records to Get More Money**

55.     When Bitwise was running out of cash in 2022, records produced by Bitwise's board showed that Olguin, Jr. and Soberal tried to start a Series C investment round.  Based on my training and experience, a Series C investment round refers to the last round of money that a company receives before an initial public offering or another liquidity event happens.  The most serious potential Series C investor that Olguin, Jr. and Soberal identified was POTENTIAL INVESTOR ONE, which is a London-based private equity firm.

56.     POTENTIAL INVESTOR ONE's REPRESENTATIVES who interacted with Olguin, Jr. and Soberal were interviewed by the government.  They said that they met with Olguin Jr. and Soberal several times and that, on May 5, 2022, POTENTIAL INVESTOR ONE executed a non-binding term sheet with Bitwise for a $150,000,000 potential investment.  They explained, however, that the proposed investment fell through a few weeks later because Olguin, Jr. and Soberal refused to provide POTENTIAL INVESTOR ONE with bank statements that showed Bitwise's cash balance.  This was a standard due diligence request that POTENTIAL INVESTOR ONE made before investing in a company.  POTENTIAL INVESTOR ONE's REPRESENTATIVES further explained that, when they asked Olguin, Jr. and Soberal for an explanation, Olguin, Jr. and Soberal said that Bitwise had multiple bank accounts and that it was difficult to understand the company's finances.  The proposed investment was subsequently terminated on May 25, 2022.  POTENTIAL INVESTOR ONE produced the term sheet and termination agreement to the government.  Both were signed by Olguin, Jr. and Soberal.

---

[2] At least one Bitwise employee who was interviewed told the government that, shortly after the collapse, he/she overheard EMPLOYEE SEVEN say that she would lie to the government for Olguin, Jr.

57.     Although POTENTIAL INVESTOR ONE terminated its proposed investment in Bitwise because Olguin Jr. and Soberal would not provide the company's cash balance, Olguin, Jr. and Soberal did not tell INVESTOR ONE this was one of the reasons why the investment did not go through. According to INVESTOR ONE, they instead told him that Bitwise had terminated the investment because POTENTIAL INVESTOR ONE did not align with the company's stated goals and culture of inclusiveness, and POTENTIAL INVESTOR ONE's due diligence requests were unfair.  Olguin, Jr. and Soberal later admitted in their government interviews that they agreed to mislead INVESTOR ONE about the reasons for the termination and concealed Bitwise's true financial condition from him.

58.     After POTENTIAL INVESTOR ONE's proposed investment was terminated, INVESTOR ONE said that Olguin, Jr. and Soberal told him Bitwise did not need the $150,000,000 and could get by with a lesser amount of money.  Therefore, INVESTOR ONE agreed to lead Bitwise in a Series B-2 investment round and invest another $5,000,000 in the company himself.  But he asked INVESTOR TWO's REPRESENTATIVE and INVESTOR TWO to prepare a due diligence memorandum that could be shared with other potential investors beforehand.  The investors in the Series B-2 would again include INVESTOR ONE and his related entities, INVESTOR TWO, and INVESTOR THREE and his related entities, as well as several institutional investors.

59.     INVESTOR TWO's REPRESENTATIVE was interviewed by the government and confirmed that INVESTOR TWO completed the due diligence memorandum for the Series B-2.  He said that the memorandum came about because potential investors were having a hard time understanding how Bitwise made money and the company needed something to easily explain it to them.  He believed that the memorandum had been shared with every investor in the Series B-2.

60.     INVESTOR TWO produced the due diligence memorandum to the government.  It was dated July 6, 2022.  The memorandum represented that Bitwise had approximately $58,000,000 in revenue for 2021 and $45,000,000 in revenue for the first quarter of 2022.  It also represented the company had over $40,000,000 in cash at the end of 2021 and $29,000,000 in cash at the end of the first quarter of 2022.

61.     Records produced by INVESTOR TWO showed that it had requested and received various financial information from Bitwise to prepare the due diligence memorandum.  This included

the purported revenues and an email, dated June 30, 2022, where Olguin, Jr. sent INVESTOR TWO's REPRESENTATIVE what purported to be Bitwise's bank statements.  Soberal and INVESTOR ONE were copied on the email.  As previously discussed, Bitwise's former CFOs and other key finance personnel confirmed that the revenues were not nearly as high as Olguin, Jr. and Soberal represented.

62.    Moreover, the bank statements that Olguin, Jr. and Soberal sent INVESTOR TWO's REPRESENTATIVE showed that Bitwise had cash balances of over $40,000,000 and $20,000,000 on December 31, 2021, and March 31, 2022, respectively.  The FBI and IRS:CI compared these bank statements to the actual statements that Bitwise's banks produced to the government.  The FBI and IRS:CI confirmed that the statements had been altered and that the company's cash balances had been significantly inflated.  Specifically, Bitwise's true balances were approximately $11,700,000 and $325,000 on December 31, 2021, and March 31, 2022, respectively, and were not over $40,000,000 and $20,000,000.  Below for comparison purposes are the altered bank statements that Olguin, Jr. and Soberal sent INVESTOR TWO's REPRESENTATIVE and the actual bank statements that Bitwise's bank produced to the government.  True and correct copies of the relevant portions of the actual bank statements with appropriate redactions to anonymize identities are attached to this affidavit as Exhibit 1:

///

///

///

**-- ALTERED BANK STATEMENTS PRESENTED BY OLGUIN, JR. AND SOBERAL --**

## ACCOUNT STATEMENT

**FIRST REPUBLIC BANK**
It's a privilege to serve you ®

### BUSINESS ANALYZED CHECKING

**Statement Period:**
December 01, 2021
December 31, 2021

**Account Number:**
XXX-XXX

000000–
00259–002

BW INDUSTRIES INC.
700 VAN NESS AVE
FRESNO, CA  93721-2912

**At Your Service:**
24-Hour Automated Banking System
(800) 392-1407

Page 1 of 13

### ACCOUNT SUMMARY                    XXX-XXX

| | | | |
|---|---|---|---|
| Beginning Balance | $36,500,530.53 | Average Daily Balance | $38,722,660.74 |
| Total Deposits and Credits | $18,500,810.29 | Minimum Balance | $32,818,789.77 |
| Total Withdrawals and Debits | $12,410,640.66- | Service Charges | $0.00 |
| Total Checks Paid | $0.00 | Interest Paid This Period | $0.00 |
| **Ending Balance** | **$42,590,700.16** | Interest Year to Date | $0.00 |

## ACCOUNT STATEMENT

**FIRST REPUBLIC BANK**
It's a privilege to serve you ®

### BUSINESS ANALYZED CHECKING

**Statement Period:**
March 01, 2022
March 31, 2022

**Account Number:**
XXX-XXX

000000–
00259–002

BW INDUSTRIES INC.
700 VAN NESS AVE
FRESNO, CA  93721-2912

**At Your Service:**
24-Hour Automated Banking System
(800) 392-1407

Page 1 of 19

### ACCOUNT SUMMARY                    XXX-XXX

| | | | |
|---|---|---|---|
| Beginning Balance | $21,514,112.14 | Average Daily Balance | $20,059,447.72 |
| Total Deposits and Credits | $14,292,041.94 | Minimum Balance | $13,429,006.64 |
| Total Withdrawals and Debits | $12,366,763.02- | Service Charges | $0.00 |
| Total Checks Paid | $0.00 | Interest Paid This Period | $0.00 |
| **Ending Balance** | **$23,439,391.06** | Interest Year to Date | $0.00 |

16

## -- RELEVANT PORTIONS OF ACTUAL BANK STATEMENTS --

### ACCOUNT STATEMENT

**FIRST REPUBLIC BANK**
It's a privilege to serve you ®

### BUSINESS ANALYZED CHECKING

**Statement Period:**
**December 01, 2021**
**December 31, 2021**

**Account Number:**
XXX-XXX8-8575

000000 -
00259-002

**BW INDUSTRIES INC.**
**700 VAN NESS AVE**
**FRESNO, CA 93721-2912**

**At Your Service:**
**24-Hour Automated Banking System**
**(800) 392-1407**

Page 1 of 3

### ACCOUNT SUMMARY              XXX-XXX8-8575

| | | | |
|---|---|---|---|
| Beginning Balance | $1,500,530.53 | Average Daily Balance | $8,722,660.74 |
| Total Deposits and Credits | $18,500,000.00 | Minimum Balance | $218,789.77 |
| Total Withdrawals and Debits | $8,301,740.76- | Service Charges | $0.00 |
| Total Checks Paid | $0.00 | Interest Paid This Period | $0.00 |
| **Ending Balance** | **$11,698,789.77** | Interest Year to Date | $0.00 |

**Account Statement**
BUSINESS ANALYZED CHECKING



**FIRST REPUBLIC BANK**
It's a privilege to serve you®

Page 1 of 5

| Statement Period: | March 01, 2022- |
| | March 31, 2022 |
| Account Number: | XXXXXX88575 |

BW INDUSTRIES INC.
700 VAN NESS AVE
FRESNO CA 93721-2912

| **Account Summary** | | **XXXXXX88575** | |
|---|---|---|---|
| Beginning Balance | $150,309.25 | Average Daily Balance | $365,829.84 |
| Total Deposits and Credits | $6,614,230.51 | Minimum Balance | $100.00 |
| Total Withdrawals and Debits | $6,439,439.76- | Service Charges | $0.00 |
| Total Checks Paid | $0.00 | Interest Paid This Period | $0.00 |
| **Ending Balance** | **$325,100.00** | Interest Year to Date | $0.00 |

63.   Olguin, Jr. and Soberal later admitted in their government interviews that they agreed to alter the bank statements and inflate Bitwise's cash balances.  They explained that they made the alterations because they believed the due diligence memorandum would be unfavorable and no one would invest in the Series B-2 if people knew the company's actual condition.

**G.   Bitwise Received Over $38,000,000 in Investments Based Upon Olguin, Jr. and Soberal's Misrepresentations**

**i.   INVESTOR ONE and INVESTOR TWO's Investments**

64.   INVESTOR ONE and INVESTOR TWO's REPRESENTATIVE confirmed that they relied upon the misrepresentations Olguin, Jr. and Soberal made in the due diligence memorandum regarding Bitwise's revenues and cash balances when they invested $5,000,000 and $250,000, respectively, in the company's Series B-2 in July 2022.  The investor representatives who were interviewed all confirmed that they dealt exclusively with Olguin, Jr. and Soberal.

65.   Records produced by other investors in the Series B-2 showed that the due diligence memorandum, or at least the fabricated revenues and fake cash balances contained therein, were in fact shared with them.  These investors confirmed that they too relied upon these misrepresentations when they invested in Bitwise.

66.   EMPLOYEE ONE recalled that, in June 2022, she was copied on an email Soberal sent to a lender that attached a bank statement showing Bitwise had a balance of $13,000,000.  She suspected that this was wrong because there was concern the company would not make payroll at that time.  EMPLOYEE ONE explained that she immediately called Olguin, Jr. and told her what Soberal had done.  Olguin, Jr. replied saying that Soberal should not have sent the bank statement.  Olguin, Jr. also told her that Soberal recently had a similar conversation with INVESTOR ONE where SOBERAL misrepresented to INVESTOR ONE that Bitwise had $50,000,000 in the bank.  Olguin, Jr. then assured EMPLOYEE ONE that Soberal's misrepresentations would be walked back.

**ii.   INVESTOR THREE's Investment**

67.   INVESTOR THREE said that Bitwise appeared to be in great financial shape when he made his $5,000,000 investment in the Series B-2 in July 2022.  He explained that the financial information Soberal gave to the board showed the company was well-capitalized.  This included a

February 2022 presentation that was also made available to all of the Series B-2 investors and that Bitwise's board produced to the government.  The presentation showed that Bitwise's cash balance at the end of 2021 was $44,329,000.  Again, as previously discussed, that number was false.  The company's cash balance was approximately $11,700,000 at that time.  INVESTOR THREE confirmed that he would not have made his investment had he known Bitwise had less than a quarter of the cash on hand that Olguin, Jr. and Soberal claimed it had.

### iii.   INVESTOR FOUR's Investment

68.   INVESTOR FOUR's REPRESENTATIVE, who is the vice president at INVESTOR FOUR that handled its $18,500,000 investment in Bitwise's Series B-2, was interviewed by the government.  INVESTOR FOUR's REPRESENTATIVE said that he started working on the Series B-2 due diligence with Soberal in early 2022 and that INVESTOR FOUR made its investment in September 2022.  He explained that Soberal sent him profit and loss statements and balance sheets that showed Bitwise's revenue and cash balance at the end of 2021 were approximately $58,000,000 and $44,000,000, respectively.  As previously discussed, these numbers were false.  INVESTOR FOUR's REPRESENTATIVE confirmed that this information was important to INVESTOR FOUR's decision to invest because, if the numbers were lower, that may have meant Bitwise was not growing as expected and INVESTOR FOUR may not have invested.

69.   INVESTOR FOUR's REPRESENTATIVE also said that, after April 2022, he repeatedly asked Soberal if Bitwise had completed a third-party audit of its 2020 financials and Soberal told him that the audit was still in process.  That was not true.  As previously discussed, AUDIT FIRM ONE had completed the audit report in April 2022.  INVESTOR FOUR's REPRESENTATIVE explained that INVESTOR FOUR would have wanted to review any audited financials that existed prior to making its investment.  He further explained that it was not until early 2023, when INVESTOR FOUR was considering another investment in Bitwise, that Soberal finally sent him the audit report.  The FBI and IRS:CI compared that audit report to the actual report that AUDIT FIRM ONE produced to the government.  The FBI and IRS:CI confirmed that the audit report had been altered.  Specifically, the completion date was changed from April 2022 to December 2022.

70.     Olguin, Jr. and Soberal later admitted in their government interviews that they agreed to alter the audit report's completion date. They explained that they made the alteration so INVESTOR FOUR would not figure out they withheld the audit report during the Series B-2 due diligence.

### iv.     **INVESTOR FIVE's Investment**

71.     INVESTOR FIVE's REPRESENTATIVES, who are attorneys for INVESTOR FIVE that the investor identified as the persons most knowledgeable about its $10,000,000 investment in Bitwise's Series B-2, were interviewed by the government. INVESTOR FIVE's REPRESENTATIVES' account for INVESTOR FIVE was similar to INVESTOR FOUR's REPRESENTATIVE's account for INVESTOR FOUR. They said that INVESTOR FIVE started working on the Series B-2 due diligence with Soberal in mid-2022 and made its investment in two, equal installments of $5,000,000 in September and December 2022. They explained that Soberal sent INVESTOR FIVE profit and loss statements that showed Bitwise's revenue at the end of 2021 was approximately $58,000,000. Again, as previously discussed, that number was false. Soberal also sent INVESTOR FIVE spreadsheets that showed Bitwise's cash balance as of July 2022 was approximately $21,800,000. Bank records, however, showed that the company's cash balance was less than $5,000,000 at that time. INVESTOR FIVE's REPRESENTATIVES confirmed that this information was important to INVESTOR FIVE's decision to invest and that INVESTOR FIVE may not have made the investment had it known that the numbers were much lower.

72.     INVESTOR FIVE's REPRESENTATIVES also said that, in August 2022, they asked Soberal if Bitwise had completed a third-party audit of its 2020 financials and Soberal told him that the audit was still in process just like he had done with INVESTOR FOUR's REPRESENTATIVE and INVESTOR FOUR. Again, as previously discussed, that was not true. The audit report had been completed months earlier. INVESTOR FIVE's REPRESENTATIVES explained that INVESTOR FIVE would have wanted to review any audited financials that existed prior to making its investment. They further explained that it was not until December 2022, which was after INVESTOR FIVE had already invested its first $5,000,000, that Soberal finally sent INVESTOR FIVE the audit report. The FBI and IRS:CI compared that audit report to the actual report that AUDIT FIRM ONE produced to the government. The FBI and IRS:CI confirmed that the audit report had been altered. The alterations

included the completion date being changed from April 2022 to December 2022, Bitwise's revenue for 2020 being increased from approximately $9,000,000 to $30,000,000, and the company's net loss for the year being decreased from approximately $26,000,000 to $9,000,000.  Below for comparison purposes is a relevant page of the altered audit report that Olguin, Jr. and Soberal sent INVESTOR TWO's REPRESENTATIVE and the same page from the actual audit report that AUDIT FIRM ONE produced to the government.  A true and correct copy of the page from the actual audit report with appropriate redactions to anonymize the identity of AUDIT FIRM ONE is attached to this affidavit as Exhibit 2.

///

///

///

-- **ALTERED AUDIT REPORT** --

---

**BW Industries, Inc. and Subsidiaries**

**CONSOLIDATED STATEMENT OF OPERATIONS**

**Year ended December 31, 2020**

| | | |
|---|---|---:|
| **Revenue** | $ | 30,130,443 |
| **Costs and expenses** | | |
| Cost of sales | | 18,701,796 |
| Selling, general and administrative expenses | | 17,202,390 |
| Depreciation and amortization | | 203,345 |
| Total expenses | | 36,107,531 |
| Loss from operations | | (5,977,088) |
| **Other income (expenses)** | | |
| Loss on disposal of assets | | (240,013) |
| Interest income (expense), net | | (865,502) |
| Other expenses | | (2,056,958) |
| Total other expenses | | (3,162,473) |
| Loss before provision for income taxes | | (9,139,561) |
| Provision for income taxes | | 280,798 |
| Net loss including noncontrolling interests | | (9,420,359) |
| Less: net loss attributable to noncontrolling interests | | (534,700) |
| **NET LOSS ATTRIBUTABLE TO BW INDUSTRIES, INC.** | $ | (8,885,659) |

///

///

///

-- **ACTUAL AUDIT REPORT** --

**BW Industries, Inc. and Subsidiaries**

**CONSOLIDATED STATEMENT OF OPERATIONS**

**Year ended December 31, 2020**

| | | |
|---|---|---:|
| **Revenue** | $ | 9,088,992 |
| **Costs and expenses** | | |
| Cost of sales | | 16,158,515 |
| Selling, general and administrative expenses | | 17,202,390 |
| Depreciation and amortization | | 203,345 |
| Total expenses | | 33,564,250 |
| Loss from operations | | (24,475,258) |
| **Other income (expenses)** | | |
| Loss on disposal of assets | | (240,013) |
| Interest income (expense), net | | (865,502) |
| Other expenses | | (1,056,958) |
| Total other expenses | | (2,162,473) |
| Loss before provision for income taxes | | (26,637,731) |
| Provision for income taxes | | 84,704 |
| Net loss including noncontrolling interests | | (26,722,435) |
| Less: net loss attributable to noncontrolling interests | | (534,700) |
| **NET LOSS ATTRIBUTABLE TO BW INDUSTRIES, INC.** | $ | (26,187,735) |

///

///

///

73.     Olguin, Jr. and Soberal later admitted in their government interviews that they agreed to make the alterations and send the altered audit report to INVESTOR FIVE.  They explained that they altered the completion date so that INVESTOR FIVE would not figure out they withheld the audit report during the Series B-2 due diligence.  They further explained that they altered the revenue and net loss numbers because they did not believe INVESTOR FIVE would have invested in Bitwise if it knew the truth about the company's financial condition.

74.     All total, Olguin, Jr. and Soberal received more than $38,000,000 from Series B-2 investors by misrepresenting Bitwise's finances to them.

**v.     Olguin, Jr. and Soberal Knew that They Were Reporting False Revenue Amounts to the Investors**

75.     While they admitted to inflating Bitwise's cash balances and altering audit reports, Olguin, Jr. and Soberal claimed to investigating agents that the false revenues they reported were due to their confusion regarding GAAP versus managerial financials.  Their contention, however, is contradicted by other evidence.  First, Bitwise's former CFOs and other key finance personnel confirmed that Olguin, Jr. and Soberal understood the difference between GAAP and managerial financials, and that Olguin, Jr. and Soberal chose managerial financials when it suited them, even after being repeatedly told that they should use the GAAP numbers.  Second, the contract documents for the Series B-2 that were prepared by Bitwise's attorneys, and given at Olguin, Jr. and Soberal's direction to investors, expressly stated that the financials the company presented were GAAP-compliant.  Third, Olguin, Jr. and Soberal altered the AUDIT FIRM ONE audit report to increase Bitwise's revenues back to what they said the revenues were before CFO ONE was hired and corrected them.

**H.   Olguin, Jr. and Soberal also Misled a Joint Venture Partner About Bitwise's Investment Prospects and Sent the Partner Altered Financial Records to Obtain Another $35,000,000**

76.     While Olguin, Jr. and Soberal were soliciting money from the Series B-2 investors, Soberal misrepresented to JOINT VENTURE PARTNER ONE, a California-based investment firm, that POTENTIAL INVESTOR ONE's proposed Series C investment in Bitwise was still going to happen. This was done to convince JOINT VENTURE PARTNER ONE to close a joint venture agreement that the companies had been negotiating for several months where Bitwise received over $35,000,000.

77.     JOINT VENTURE PARTNER ONE's REPRESENTATIVE was the principal at JOINT VENTURE PARTNER ONE who interacted with Olguin, Jr. and Soberal, and he was interviewed by the government.  JOINT VENTURE PARTNER ONE's REPRESENTATIVE said that, under the joint venture agreement, JOINT VENTURE PARTNER ONE purchased the majority stake in multiple buildings that Bitwise owned in Fresno and Bakersfield and reimbursed Bitwise for capital improvements it made to the buildings.  Bitwise was then supposed to lease back the buildings from JOINT VENTURE PARTNER ONE and sublease spaces therein to other tenants for a share of the rental revenue.  Bitwise was also required to maintain certain cash balances in dedicated accounts, called Deposit Account Control Agreement ("DACA") accounts, to ensure there were sufficient funds to cover eighteen months' worth of rent for each of the buildings.  Finally, Bitwise was required to provide various financial information to JOINT VENTURE PARTNER ONE upon request.  JOINT VENTURE PARTNER ONE's REPRESENTATIVE explained that POTENTIAL INVESTOR ONE's investment and Bitwise's maintenance of the DACA accounts were important to JOINT VENTURE PARTNER ONE, and that JOINT VENTURE PARTNER ONE would not have gone through with the joint venture without these terms.

78.     JOINT VENTURE PARTNER ONE produced financial records showing that it purchased the first Bitwise building in June 2022, purchased the last Bitwise building in July 2022, and reimbursed Bitwise for capital improvements in August 2022.  Altogether, JOINT VENTURE PARTNER ONE paid Bitwise over $35,000,000 for a ninety-five percent ownership stake in the buildings.  JOINT VENTURE PARTNER ONE also produced an email, dated June 9, 2022, where Soberal represented to JOINT VENTURE PARTNER ONE's REPRESENTATIVE that POTENTIAL INVESTOR ONE's proposed investment was on track to close.  This was two weeks after Bitwise and POTENTIAL INVESTOR ONE had cancelled the investment.

79.     According to JOINT VENTURE PARTNER ONE's REPRESENTATIVE, it was not until October 2022 that Soberal told him POTENTIAL INVESTOR ONE's proposed investment had been terminated and that Bitwise had instead decided to accept approximately $60,000,000 in investments from the Series B-2 investors.  In an email produced by JOINT VENTURE PARTNER ONE, dated early October 2022, Soberal told JOINT VENTURE PARTNER ONE's

REPRESENTATIVE the purported reasons why Bitwise made this decision.  Just like he did with

INVESTOR ONE, Soberal misled JOINT VENTURE PARTNER ONE's REPRESENTATIVE by

telling him that the Series B-2 investors were more aligned with Bitwise's goals and culture of

inclusiveness.  Soberal also told JOINT VENTURE PARTNER ONE's REPRESENTATIVE that this

decision was not a sign of diminished financial health of Bitwise and that Bitwise was in a healthier

financial position than ever before.

80.    JOINT VENTURE PARTNER ONE's REPRESENTATIVE said that he was shocked

Soberal misled him about POTENTIAL INVESTOR ONE's proposed investment.  He explained that

JOINT VENTURE PARTNER ONE subsequently requested bank statements and other financial records

from Bitwise to which it was entitled under the joint venture agreement because it no longer trusted

Soberal and was concerned that Bitwise was in financial trouble.

81.    When Soberal did not respond to the requests, JOINT VENTURE PARTNER ONE sent

Bitwise a notice of default.  In an email that JOINT VENTURE PARTNER ONE produced, dated

December 20, 2022, Soberal responded to the notice by sending JOINT VENTURE PARTNER ONE's

REPRESENTATIVE redacted bank statements for Bitwise's corporate account and the DACA accounts.

82.    JOINT VENTURE PARTNER ONE's REPRESENTATIVE said that JOINT VENTURE

PARTNER ONE questioned the redactions.  So, in another email that JOINT VENTURE PARTNER

ONE produced, dated January 9, 2023, Soberal sent JOINT VENTURE PARTNER ONE's

REPRESENTATIVE unredacted versions of the same bank statements through an attorney.  The bank

statements were for the period July through December 2022.  The FBI and IRS:CI compared these bank

statements to the actual statements that Bitwise's banks produced to the government.  Just like with the

Series B-2 investment, the FBI and IRS:CI confirmed that the statements had been altered and that the

account balances had been significantly inflated.  Specifically, the balance for Bitwise's corporate

account was inflated to make it appear as though the account had several millions of dollars when, in

fact, the account did not reach more than $1,000,000 during the relevant period.  And the balances for

the DACA accounts were inflated to make it appear as though the accounts had hundreds of thousands

of dollars when, in fact, the accounts did not reach more than a few thousand dollars.

83.     While JOINT VENTURE PARTNER ONE was trying to get financial records from Soberal, JOINT VENTURE PARTNER ONE's REPRESENTATIVE said that he attended Bitwise board meetings where Soberal represented that the company was performing well.  JOINT VENTURE PARTNER ONE's REPRESENTATIVE explained that he attended the meetings as an observer, which he was allowed to do pursuant to the joint venture agreement.  He further explained that, at the March 2023 board meeting, Soberal represented Bitwise had a cash balance of approximately $77,000,000.  He could not understand why Soberal was refusing to provide the requested financial records to JOINT VENTURE PARTNER ONE when Bitwise was purportedly doing so well.  He figured that Soberal would want to tout Bitwise's success.

84.     JOINT VENTURE PARTNER ONE's REPRESENTATIVE said that JOINT VENTURE PARTNER ONE started looking for a way to end its relationship with Bitwise as soon as it learned that POTENTIAL INVESTOR ONE's proposed investment had been terminated.  JOINT VENTURE PARTNER ONE's REPRESENTATIVE explained that Soberal proposed buying the buildings back from JOINT VENTURE PARTNER ONE and he pursued that potential deal until May 2023 when he learned Bitwise had simultaneously listed the buildings for sale and used them to collateralize millions of dollars in loans without authorization.  JOINT VENTURE PARTNER ONE's REPRESENTATIVE confirmed that JOINT VENTURE PARTNER ONE did not get any of its money back from Bitwise and is in litigation with the lender that collateralized the buildings over who has rights to the buildings.

85.     Olguin, Jr. claimed to investigating agents that she did not recall misleading JOINT VENTURE PARTNER ONE about the status of POTENTIAL INVESTOR ONE's proposed investments, but she stated that she could not rule it out.  Soberal, however, admitted to misleading JOINT VENTURE PARTNER ONE in this regard because Bitwise needed the money.

**I.    Olguin, Jr. and Soberal also Obtained an Advance on a Multi-Million-Dollar Tax Credit and Repaid it with Funds Fraudulently Obtained from Others**

86.     In an effort to obtain more funds, from October 2022 through April 2023, Olguin, Jr. and Soberal sold Bitwise's rights to approximately $6,000,000 in Employee Retention Credits ("ERC") that Bitwise received to COMPANY ONE, which is a New York-based company, for eighty-five cents on the dollar.  ERCs are refundable federal tax credits that certain employers received for keeping their

employees on the payrolls during the COVID-19 pandemic.  ERCs are worth thousands of dollars for each employee retained.  As discussed below in paragraphs 91 through 96 below, Olguin, Jr. and Soberal then repaid COMPANY ONE with money they fraudulently obtained from others.

87.     Records that COMPANY ONE's representative produced showed COMPANY ONE entered into the ERC agreements with Bitwise in October and November 2022.  Shortly thereafter, bank records showed that COMPANY ONE wired over $5,000,000 to Bitwise.

88.     In a text message produced by EMPLOYEE FOUR, dated January 3, 2023, she told Soberal that the ERC checks had been received from the IRS.  She then asked Soberal if she should deposit the checks into Bitwise's account to get Bitwise through the week and figure out a way to pay back COMPANY ONE.  Soberal replied, "Yes, do this."  Bank records showed that the checks were deposited into Bitwise's account that same day.

89.     In emails produced by COMPANY ONE's representative, dated January 4, 2023, through January 9, 2023, the representative asked Soberal about the status of the ERC checks and Soberal said that he did not know what happened to them.  Then, in an email dated March 16, 2023, the representative told Soberal that he knew the checks had been deposited into Bitwise's bank account and Soberal replied, "This would be news to me …"  A few weeks later, COMPANY ONE sued Bitwise for breach of contract.

90.     Records produced by COMPANY ONE's representative showed that Soberal subsequently sent COMPANY ONE a signed letter, dated April 19, 2023, that was purportedly from a representative at Bitwise's bank confirming Bitwise had over $6,500,000 in its account with which to pay back COMPANY ONE.  Bank records, however, showed that Bitwise had far less in the account at that time.  Soberal later admitted in his government interview that he fabricated the bank letter, inflated Bitwise's account balance, and forged the bank representative's signature to buy more time to pay back COMPANY ONE.

91.     Ultimately, Olguin, Jr. and Soberal obtained fraudulent loans from various companies to payback COMPANY ONE, including the California-based private lender COMPANY TWO.  COMPANY TWO's REPRESENTATIVE was the principal at COMPANY TWO who interacted with Olguin, Jr. and Soberal.

92.     According to publicly available court records, COMPANY TWO's REPRESENTATIVE said that Soberal called him on April 25, 2023, and asked him for a loan so that Bitwise could repay COMPANY ONE.  He explained that Soberal represented Bitwise had a current cash balance of over $65,000,000.  Soberal told him, however, that Bitwise could not use that money because the company had a minimum liquidity requirement with its investor, INVESTOR FOUR, where Bitwise agreed to keep that amount of cash on hand.  COMPANY TWO's REPRESENTATIVE asked Soberal to send him a bank statement showing that Bitwise had the $65,000,000 before agreeing to make the loan and Soberal did so.  COMPANY TWO's REPRESENTATIVE further explained that Soberal assured him Bitwise was doing well financially.  Among other things, Soberal told him that the company's revenues in 2022 exceeded $200,000,000.  As previously discussed, that number was false.

93.     In an email produced by COMPANY TWO, dated April 26, 2023, Soberal sent COMPANY TWO's REPRESENTATIVE the requested bank statement showing Bitwise had $65,000,000 in an account.  The FBI and IRS:CI compared that bank statement to the actual statement that Bitwise's bank produced to the government.  The FBI and IRS:CI confirmed that, just like with the Series B-2 investment and JOINT VENTURE PARTNER ONE, the statement had been altered and Bitwise's account balance had been significantly inflated.  Specifically, the account had less than $2,000,000 at that time.

94.     Records produced by COMPANY TWO showed that the loan was approved on April 26, 2023, and that COMPANY TWO wired $1,000,000 to Bitwise that same day.  The loan agreement was signed by both Olguin, Jr. and Soberal.  Bank records showed that two days later, on April 28, 2023, Bitwise sent all of that money to COMPANY ONE.

95.     COMPANY TWO's REPRESENTATIVE said that one month later, on May 29, 2023, Soberal called to tell him that Bitwise had fallen on hard times and that the company was going to furlough its employees.  COMPANY TWO's REPRESENTATIVE explained that he was stunned and asked Soberal what had happened to the $65,000,000 that Bitwise supposedly had on hand.  Soberal told him that it had been used to repay other investors and was now mostly gone.

96.     Olguin, Jr. and Soberal later admitted in their government interviews that they agreed to send COMPANY TWO altered bank statements to get the $1,000,000 loan and repay COMPANY ONE.

Bank records and other evidence showed that most of the remaining money Bitwise owed to COMPANY ONE was repaid with another $4,400,000 in loans that Olguin, Jr. and Soberal fraudulently obtained from a California-based beverage company and California-based individual as set forth below.

**J.   As the End Neared for Bitwise, Olguin, Jr. and Soberal Misled Other Businesses and Individuals to Obtain Another $30,000,000**

97.     In the months and weeks leading up to Bitwise's collapse, Olguin, Jr. and Soberal misrepresented the company's finances to several businesses and people to obtain millions more in loans from them.  This included longstanding business partners, as well as Bitwise's own board members and employees and their friends and family.

98.     For example, INVESTOR THREE said that, in April 2023, Soberal asked him to loan $10,000,000 to Bitwise because the company was having trouble with one of its lines of credit. INVESTOR THREE explained that this did not surprise him because credit standards had tightened during the COVID-19 pandemic.  He further explained that the last financial information he received from Olguin, Jr. and Soberal showed the company had approximately $80,000,000 in cash at the end of 2022 and that the company appeared to be as far away from trouble as possible.  INVESTOR THREE's statement was corroborated by the March 2023 Bitwise board presentation prepared by Olguin, Jr. and Soberal that Bitwise's board produced to the government.  As previously discussed, they represented in that presentation that the company had a cash balance of over $77,000,000 on December 31, 2022.  But bank records showed that the company's actual balance was less than $5,000,000 at that time.

99.     INVESTOR THREE confirmed that he decided to make the loan because he was led to believe Bitwise was doing well and he would not have done so had he known what was really going on at the company.

100.     As another example, the government interviewed LENDER ONE.  LENDER ONE said that he had successfully lent money to Soberal and Bitwise in the past and that, from January through March 2023, Soberal provided him and his business partner with various board consents and other documents that made it appear as though the company was the sole owner of several office buildings. LENDER ONE produced these documents to the government.  Importantly, the buildings were the same ones that Bitwise previously sold to JOINT VENTURE PARTNER ONE.

101.    Based on these documents, LENDER ONE and his business partner agreed to loan over $20,000,000 to Bitwise with the buildings serving as collateral.  He explained that the loans were syndicated, which meant that the loans were funded by himself, his business partner, and several other people who relied upon him and his business partner to perform the due diligence.

102.    LENDER ONE confirmed that he and his business partner would not have made the loans without the buildings as the collateral.  Moreover, Bitwise's board members all confirmed that their signatures on the board consents Soberal sent to LENDER ONE had been forged and that they were unaware of the consents.

103.    As yet another example, EMPLOYEE NINE, who worked for Bitwise for over five years, was interviewed by the government.  EMPLOYEE NINE said that he had previously lent Bitwise $100,000 and was quickly paid back in 2022.  Then, in March 2023, Soberal asked him if he wanted to lend another $100,000 on the same terms.  EMPLOYEE NINE explained that Bitwise had just announced the close of the Series B-2 and all signs from Olguin, Jr. and Soberal were the company had more than enough resources to repay the loan.  Therefore, he decided to go through with the loan.  As previously discussed, however, the company was collapsing, and Olguin, Jr. and Soberal were making last-ditch efforts to keep it going.

104.    The government's investigation identified several other businesses, and former Bitwise employees and their friends and family, who altogether lent the company over $4,500,000 near the time the company collapsed because Olguin, Jr. and Soberal assured them of the company's stability.  This included a California-based beverage company that loaned $3,000,000, a California-based individual who loaned $1,400,000, EMPLOYEE TWO who loaned $100,000, and EMPLOYEE SEVEN and her friend who loaned $40,000 and $100,000, respectively.  The misrepresentations that Olguin, Jr. and Soberal made to them included that the company was generating substantial revenues, had so much money coming in that the banks could not handle it, and had approximately $65,000,000 in cash on hand.  As discussed throughout this affidavit, these representations were false, and Olguin, Jr. and Soberal admitted to misleading these people in their government interviews.  The government has not found any evidence that these loans have been repaid.

### K. Interstate Wire Transfers

105. Bank records produced to the government showed that many of the above-mentioned investments and loans made to Bitwise based on Olguin, Jr. and Soberal's misrepresentations were sent by interstate wire transfers to Bitwise's bank account opened in Fresno, California. This included the following transactions:

| Date | Description | Amount | Interstate Nexus | Received By |
|---|---|---|---|---|
| 07/18/22 | INVESTOR ONE B-2 investment | $5,000,000.00 | Wire transfer routed through a computer in Illinois | Bitwise account ending 738 in Fresno, CA |
| 09/01/22 | INVESTOR FOUR B-2 investment | $18,499,999.50 | Wire transfer routed through a computer in Delaware | Bitwise account ending 738 in Fresno, CA |
| 09/09/22 | INVESTOR FIVE B-2 investment | $5,000,000.00 | Wire transfer routed through a computer in New York | Bitwise account ending 738 in Fresno, CA |
| 12/21/22 | INVESTOR FIVE B-2 investment | $5,000,000.00 | Wire transfer routed through a computer in New York | Bitwise account ending 738 in Fresno, CA |
| 01/17/23 | LENDER ONE loan | $3,500,000.00 | Wire transfer routed through a computer in Connecticut | Bitwise account ending 738 in Fresno, CA |
| 01/31/23 | LENDER ONE loan | $6,720,000.00 | Wire transfer routed through a computer in Connecticut | Bitwise account ending 738 in Fresno, CA |
| 03/16/23 | LENDER ONE loan | $3,132,172.00 | Wire transfer routed through a computer in Connecticut | Bitwise account ending 738 in Fresno, CA |
| 03/16/23 | LENDER ONE loan | $710,000.00 | Wire transfer routed through a computer in New York | Bitwise account ending 738 in Fresno, CA |
| 04/05/23 | INVESTOR THREE loan | $10,000,000.00 | Wire transfer routed through a computer in Illinois | Bitwise account ending 738 in Fresno, CA |

1    **L.   Use of the Money**

2        106.    Much of the money Olguin, Jr. and Soberal obtained by fraud went towards paying

3    Bitwise's payroll and fringe benefits, including their $600,000 per year salaries, outfitting the

4    company's office spaces, and repaying debts owed to prior lenders.

5                   **IV.   SEALING REQUEST**

6        107.    I request that the Court order all papers in support of the requested criminal complaint

7    and arrest warrants be sealed until further order of the Court.  These documents discuss an ongoing

8    government investigation that is not yet public.  Moreover, the extent of the investigation is not fully

9    known to the targets.  Therefore, there is good cause to seal these documents because their premature

10   disclosure may jeopardize the investigation, including by giving the targets an opportunity to destroy or

11   tamper with evidence, change patterns of behavior, notify confederates, or flee.

12   ///

13   ///

14   ///

33

## V.   <u>CONCLUSION</u>

108.   I submit the evidence discussed in this affidavit establishes probable cause to believe that, from at least January 2022 through May 2023, Olguin, Jr. and Soberal conspired to commit wire fraud in violation of 18 U.S.C. § 1349.  Therefore, I request that a criminal complaint and arrest warrants be issued for them.

I declare under penalty of perjury the foregoing is true and correct to the best of my knowledge:

Respectfully submitted:

_____
Chet Johnston
FBI Special Agent

Approved as to form:

 /s/ Joseph Barton
Joseph D. Barton
Henry Z. Carbajal III
Assistant United States Attorneys

Affidavit submitted by email and pdf and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4(d) and 4.1 before me this 8th_____ day of November 2023:

_____
Honorable Sheila K. Oberto
United States Magistrate Judge

# EXHIBIT 1



ACCOUNT STATEMENT

FIRST REPUBLIC BANK
It's a privilege to serve you

# BUSINESS ANALYZED CHECKING

**Statement Period:**
**December 01, 2021**
**December 31, 2021**

**Account Number:**
**XXX-XXX8-8575**

000000-
00259-002

BW INDUSTRIES INC.
700 VAN NESS AVE
FRESNO, CA  93721-2912

**At Your Service:**
**24-Hour Automated Banking System**
**(800) 392-1407**

Page  1   of 3

## ACCOUNT SUMMARY

| | | XXX-XXX8-8575 | |
|---|---:|---|---:|
| Beginning Balance | $1,500,530.53 | Average Daily Balance | $8,722,660.74 |
| Total Deposits and Credits | $18,500,000.00 | Minimum Balance | $218,789.77 |
| Total Withdrawals and Debits | $8,301,740.76- | Service Charges | $0.00 |
| Total Checks Paid | $0.00 | Interest Paid This Period | $0.00 |
| **Ending Balance** | **$11,698,789.77** | Interest Year to Date | $0.00 |

## ACCOUNT ACTIVITY

| DATE | DESCRIPTION | AMOUNT |
|---|---|---:|
| | **Deposits and Credits** | |
| 12/08 | INCOMING WIRE ██████████ - CASH | $2,500,000.00 |
| 12/08 | INCOMING WIRE ██████████ | $1,000,000.00 |
| 12/10 | INCOMING WIRE ██████████ | $12,000,000.00 |
| 12/20 | INCOMING WIRE ██████████ | $2,000,000.00 |
| 12/29 | INCOMING WIRE ██████████ | $1,000,000.00 |
| | ***Total Deposits and Credits*** | **$18,500,000.00** |
| | **Withdrawals and Debits** | |
| 12/01 | ACH DEBIT VLL IX/VLL9 ACH ID#9162 | $140,870.38- |
| 12/01 | ACH DEBIT VLL VIII/VLL8 ACH ID#8485 | $140,870.38- |
| 12/03 | DOMESTIC ONLINE WIRE BW INDUSTRIES INC | $1,000,000.00- |
| 12/08 | DOMESTIC ONLINE WIRE BW INDUSTRIES INC | $1,000,000.00- |
| 12/10 | DOMESTIC ONLINE WIRE BW INDUSTRIES INC | $1,000,000.00- |
| 12/13 | DOMESTIC ONLINE WIRE ██████████ | $20,000.00- |


000000

III PINE STREET, SAN FRANCISCO, CALIFORNIA 94III, TEL (415) 392-I400 OR I-800-392-I400
24 HOUR AUTOMATED BANKING SYSTEM I-800-392-1407
WWW.FIRSTREPUBLIC.COM · MEMBER FDIC

FRB 308 - 5/10

# Account Statement

BUSINESS ANALYZED CHECKING



## FIRST REPUBLIC BANK
It's a privilege to serve you®

**Page 1 of 5**

| | |
|---|---|
| **Statement Period:** | **March 01, 2022-** |
| | **March 31, 2022** |
| **Account Number:** | **XXXXXX88575** |

BW INDUSTRIES INC.
700 VAN NESS AVE
FRESNO CA 93721-2912

## Account Summary                XXXXXX88575

| | | | |
|---|---|---|---|
| Beginning Balance | $150,309.25 | Average Daily Balance | $365,829.84 |
| Total Deposits and Credits | $6,614,230.51 | Minimum Balance | $100.00 |
| Total Withdrawals and Debits | $6,439,439.76- | Service Charges | $0.00 |
| Total Checks Paid | $0.00 | Interest Paid This Period | $0.00 |
| **Ending Balance** | **$325,100.00** | Interest Year to Date | $0.00 |

## Account Activity

| Date | Description | Amount |
|---|---|---|
| | **Deposits and Credits** | |
| 03/01 | INTERNET TRANSFER FROM ████████ ON 03/01 AT 09:20 | $150,000.00 |
| 03/01 | INTERNET TRANSFER FROM ████████ ON 03/01 AT 10:39 | $850,000.00 |

# EXHIBIT 2

# Consolidated Financial Statements and Report of Independent Certified Public Accountants

## BW Industries, Inc. and Subsidiaries

December 31, 2020

**Contents**                                                                    Page

Report of Independent Certified Public Accountants                              3

Consolidated Financial Statements

   Consolidated balance sheet                                    5

   Consolidated statement of operations                          6

   Consolidated statement of stockholders' equity                7

   Consolidated statement of cash flows                          8

   Notes to consolidated financial statements                    9

**BW Industries, Inc. and Subsidiaries**

**CONSOLIDATED STATEMENT OF OPERATIONS**

**Year ended December 31, 2020**

| | | |
|---|---|---:|
| **Revenue** | $ | 9,088,992 |
| **Costs and expenses** | | |
| Cost of sales | | 16,158,515 |
| Selling, general and administrative expenses | | 17,202,390 |
| Depreciation and amortization | | 203,345 |
| Total expenses | | 33,564,250 |
| Loss from operations | | (24,475,258) |
| **Other income (expenses)** | | |
| Loss on disposal of assets | | (240,013) |
| Interest income (expense), net | | (865,502) |
| Other expenses | | (1,056,958) |
| Total other expenses | | (2,162,473) |
| Loss before provision for income taxes | | (26,637,731) |
| Provision for income taxes | | 84,704 |
| Net loss including noncontrolling interests | | (26,722,435) |
| Less: net loss attributable to noncontrolling interests | | (534,700) |
| **NET LOSS ATTRIBUTABLE TO BW INDUSTRIES, INC.** | $ | (26,187,735) |

The accompanying notes are an integral part of this consolidated financial statement.